2024 IL App (1st) 230404-U

No. 1-23-0404

Order filed September 30, 2024

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 19 CR 1918 |
| | ) | |
| VALENTINO WILBOURN, | ) | Honorable |
| | ) | Carol M. Howard, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court. Justices Lavin and Pucinski concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's convictions for aggravated criminal sexual assault are affirmed where the State proved the aggravating factor for the offenses. The record on appeal is insufficient to resolve defendant's claim of ineffective assistance of counsel for failing to question the victim regarding a prior statement and to question another witness regarding that statement. Consequently, the record also does not allow review of defendant's claim that the trial court abused its discretion in denying defendant's request for a continuance to recall that witness.

¶ 2    Following a bench trial, defendant Valentino Wilbourn was found guilty of two counts of

aggravated criminal sexual assault (720 ILCS 5/11-1.30(a)(3) (West 2018)). Defendant was

sentenced to two consecutive terms of eight years' imprisonment. On appeal, defendant contends that (1) the State failed to prove the aggravating factor for his convictions; (2) defense counsel was ineffective for failing to elicit necessary testimony from a witness; and (3) the trial court wrongly denied counsel's request for a continuance to recall that witness. We affirm.

¶ 3 Defendant was charged by indictment with 12 counts of aggravated criminal sexual assault and 3 counts of aggravated criminal sexual abuse arising from a series of incidents from November 1, 2017, through November 1, 2018, related to his daughter, N.W. Relevant here, aggravated criminal sexual assault counts III (penis to mouth contact) and V (penis to vagina contact) alleged that defendant committed the sexual penetration acts by the use of force or threat of force and acted in such a manner as to threaten or endanger the life of N.W. or her mother.

¶ 4 On the day of trial, defense counsel moved for a continuance so that Karen Wilson, an Illinois Department of Children and Family Services employee, could testify that she interviewed N.W., who denied the sexual abuse. Defense counsel also stated that Latoya Nesbitt, one of the defense's witnesses, was present in court but needed to leave early. The court denied the motion, but stated that it would start the State's case-in-chief and, if necessary, take a short continuance for Wilson and Nesbitt to testify.

¶ 5 N.W. testified that she was 19 years old at the time of trial and defendant was her father. In November 2017, N.W. was 14 years old and lived with defendant, her mother, and her younger brother. One night, defendant entered N.W.'s room when she was asleep and turned the light on and off. Defendant stood over N.W.'s bed for approximately five minutes. Defendant rubbed his hands in a circular motion over N.W.'s "butt," over her pants. He then lay on top of N.W., who was lying on her stomach, and rubbed his body "up and down," which he "taught" her was

"grinding." Specifically, defendant rubbed his penis against N.W.'s "butt," made "noises," and commented about how "good" it felt. Defendant was wearing only underwear, and N.W. was clothed at the time. After approximately 10 minutes, N.W. moved, and defendant left the room.

¶ 6 Another time, when N.W. was still 14 years old, she was alone in her bedroom and defendant entered and turned the light on and off. He touched N.W.'s breasts with his hands both over and under her shirt, and then sucked her breasts with his mouth under her shirt. Defendant pulled N.W.'s pants down, left the room, and returned with a condom, which he placed on his penis. Defendant "grab[bed]" N.W.'s head and leaned her toward his penis. He "had" her open her mouth and placed his penis inside it. Defendant "had [N.W.] do it for a couple of minutes," stopped, and instructed her to wipe herself off in the bathroom.

¶ 7 In another incident, defendant entered N.W.'s bedroom and instructed her to go to her mother's bed, in the bedroom her mother shared with defendant. N.W. complied because she did not want defendant to hurt her mother. Defendant had placed a thick white extension cord on the bed. He instructed N.W. to remove her clothes "because [she] knew what time it was."

¶ 8 When N.W. was undressed, defendant, "as he always [did]," started touching N.W.'s breasts with his mouth and then, after telling her to get into the bed, moved his mouth down to her vagina. Next, defendant retrieved a condom from the dresser and placed it on his penis. Defendant asked N.W. to let him place "the tip in," and "his penis tried to go into" N.W.'s vagina. N.W. assumed it did not "fit." Defendant rubbed Vaseline on her vagina, again tried, and was able to insert the tip of his penis inside. He told N.W. to "move." She did not because it hurt "so bad." N.W. told defendant "multiple times" that it hurt, but defendant "just stayed there," doing what he wanted to do.

¶ 9      Defendant eventually stopped and instructed N.W. to go to the bathroom. There, defendant said that if N.W. told her mother, her mother would not believe her. They argued about that until defendant hit her face and told her that she had a "smart mouth." N.W.'s mother was at work at the time. N.W. testified that similar incidents occurred approximately 10 times when her mother was at work.

¶ 10     In a later incident in N.W.'s mother's bedroom, defendant showed N.W. a pornographic video on his phone with an "older man" and a "younger girl." Defendant said N.W. needed to learn "how to do some of the stuff the girl was doing in the video." Afterward, N.W. got undressed "like always," defendant placed a condom on his penis "like usual," and unsuccessfully tried to place his penis into N.W.'s vagina.

¶ 11     N.W. testified that the first incident occurred when she was 14 years old, and several of the incidents happened after her next birthday. Asked whether she and defendant argued or exchanged words "during" any of the sexual assaults that followed the argument in the bathroom, the following exchange occurred:

"[N.W.] Sometimes.

Q. And what would those words be?

[N.W.] He would get the extension cord, he would threaten to kill my mama. He would just be very, very violent and say violent stuff to me.

Q. You say that he threatened you with the extension cord. What did he threaten or what did he say about the extension cord?

[N.W.] That he would beat me with a extension cord if I don't do what he say.

Q. And when -- Strike that. You said he threatened that he would kill your mom?

[N.W.] Yes, he did.

Q. And what did he say in regards to that?

[N.W.] That -- He says when she come home from work, he would beat her."

N.W. did not tell anyone about the incidents because she did not want anything to happen to her mother.

¶ 12    On cross-examination, N.W. stated she met Nesbitt once at N.W.'s house, but did not know that Nesbitt was dating defendant. N.W. never told any friends or her mother about the incidents. Defendant never hit N.W. with the extension cord, and only injured N.W. when he slapped her. DCFS caseworker Wilson interviewed N.W. once at N.W.'s school. N.W. lied to Wilson, denying any sexual abuse. N.W. was not afraid of her brother, her mother, or Wilson, but did not tell them about the abuse.

¶ 13    On redirect examination, N.W. testified she was afraid of defendant. When she spoke with Wilson, only the first "grinding" incident had occurred. N.W. denied to Wilson that the sexual abuse occurred because defendant told her not to say anything. The incidents occurred at approximately 6 a.m., after N.W.'s mother left for work.

¶ 14    The State submitted into evidence defendant's birth certificate, which is in the record and has been viewed by this court. It reflects that defendant was born on June 20, 1981.

¶ 15    Nesbitt testified on behalf of the defense that she had been dating defendant for six years at the time of trial. Nesbitt met N.W.'s mother but did not know how many times they had met; their relationship was "friendly." In 2018, defendant supported N.W. financially.

¶ 16    On cross-examination, Nesbitt agreed with the State that she did not want anything bad to happen to defendant. After the close of Nesbitt's cross-examination, the court asked whether either side needed Nesbitt "again." Both counsels stated that they did not. The court then thanked Nesbitt and told her that she was "free to go."

¶ 17    After Nesbitt's testimony, defense counsel asked to continue the trial because she wished to "possibly" call Wilson, although she noted that "that kind of took care of itself." The court responded that there was "no need" to call Wilson because N.W. admitted that she lied to Wilson; therefore, perfecting the impeachment was unnecessary. Counsel then requested a continuance for defendant to testify, which the court allowed.

¶ 18    On the next court date, defendant declined to testify. Defense counsel informed the court that she forgot to ask Nesbitt a line of questions, but Nesbitt was unable to be in court that day because she lived in St. Louis and there was a blizzard. Counsel requested a "short date" to recall her as a witness. The court denied the request for a continuance and stated that defense counsel was "given ample opportunity to ask" the required questions. Defense counsel then stated:

> "Judge, if I can make an offer of proof. If I did recall *** Nesbitt, what I was going to ask
> her was if she was present for the bond hearing for [defendant] in this case and was [N.W.]
> present and crying in the courtroom [defendant] didn't do these things."

¶ 19    The State objected, arguing that Nesbitt's response to the question would be hearsay. The court acknowledged the "offer of proof," but noted that Nesbitt had testified "under both cross and direct examination" and that counsel had "an opportunity to ask her those questions." The court reiterated that it had asked the parties if they had further questions for Nesbitt, and "[b]oth sides said they did not."

¶ 20    In closing, the State argued that defendant "threatened to hurt [N.W.'s] mother," and "threatened to beat [N.W.] with an extension cord." The State argued that N.W. was afraid of defendant. Defense counsel argued that N.W. lied about the sexual abuse, and never told anyone about defendant's actions despite having many opportunities to do so.

¶ 21    The court found defendant guilty of counts III and V for aggravated criminal sexual assault and found defendant not guilty of the remaining counts. The court noted that it observed N.W. and found her to be credible, with her testimony being "compelling in some respects." Although N.W.'s testimony was "undermined to a certain extent" by her admitting that she lied to Wilson, N.W. explained why she did so: defendant "told her he would harm her mother if she told anyone." The court noted that even though no physical evidence corroborated the allegations, N.W.'s testimony supported two of the counts, but it was not detailed enough regarding any other incident.

¶ 22    Defense counsel filed a motion for a new trial, arguing in relevant part that the court erred by finding N.W.'s testimony credible, and the State did not present any corroborative evidence of N.W.'s claims. Counsel noted that the court denied counsel's request for a continuance to recall Nesbitt. The court denied defendant's motion after a hearing, noting that it found N.W. credible, and defense counsel had the opportunity to elicit testimony from Nesbitt, so it was unnecessary to recall her.

¶ 23    After a sentencing hearing, the court imposed two consecutive terms of eight years' imprisonment. Defendant did not file a motion to reconsider sentence.

¶ 24    On appeal, defendant first argues that the State failed to prove the aggravating factor charged in the indictment such that his aggravated criminal sexual assault convictions must be reduced to criminal sexual assault. Specifically, defendant contends that the State failed to prove

that, during commission of the criminal sexual assaults, he acted in a manner that threatened and endangered the life of N.W. or her mother.

¶ 25    As an initial matter, the parties disagree about the applicable standard of review. Defendant argues that the trial court's factual findings should be reviewed under the reasonable doubt standard, but whether his actions threatened or endangered N.W. or her mother's life during the commission of the sexual assaults involves statutory interpretation which we review *de novo*. See *People v. Giraud*, 2012 IL 113116, ¶ 6 (reviewing *de novo* whether "a defendant's knowingly exposing the victim of a sexual assault to HIV *** constitutes a threat or endangerment of her life during the commission of the offense" as contemplated by the aggravated criminal sexual assault statute). The State contends that defendant is solely challenging the sufficiency of the trial evidence to establish the aggravating factor of the offenses.

¶ 26    We agree with the State, as whether defendant committed actions that threatened or endangered anyone's life and whether those actions occurred during commission of the offenses are questions of fact concerning the sufficiency of the evidence, not matters of statutory interpretation. See *People v. Garcia*, 2024 IL App (1st) 211246-U, ¶¶ 14-18 (considering the sufficiency of the evidence to establish the aggravating factor where the defendant held the minor victim by the throat when sexually assaulting her).[1]

¶ 27    The standard of review for a challenge to the sufficiency of the evidence is "whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Internal quotation marks

---

[1] Under Illinois Supreme Court Rule 23(e)(1) (eff. Feb. 1, 2021), unpublished cases entered on or after January 1, 2021, may be cited for persuasive purposes.

omitted.) *People v. Belknap*, 2014 IL 117094, ¶ 67. The trier of fact resolves conflicts in the testimony, weighs the evidence, and draws reasonable inferences from basic facts to ultimate facts. *People v. Brown*, 2013 IL 114196, ¶ 48. Accordingly, this court will not retry the defendant or substitute its judgment for that of the trier of fact on the weight of the evidence or credibility of witnesses. *Id*. A reviewing court must allow all reasonable inferences from the record in favor of the prosecution (*People v. Cunningham*, 212 Ill. 2d 274, 280 (2004)), and will not reverse a conviction unless the evidence is "unreasonable, improbable, or so unsatisfactory as to justify a reasonable doubt of the defendant's guilt" (*People v. Jackson*, 232 Ill. 2d 246, 281 (2009) (internal quotation marks omitted)).

¶ 28    To prove aggravated criminal sexual assault as charged here under section 11-30(a)(3) of the Criminal Code, the State had to prove that (1) defendant committed criminal sexual assault, *i.e.*, an act of sexual penetration on N.W. using force or threat of force (720 ILCS 5/11-1.20 (West 2018)), and (2) the aggravating circumstance that, "during the commission of the offense," he acted "in a manner that threaten[ed] or endanger[ed] the life" of N.W. or her mother. 720 ILCS 5/11-1.30(a)(3) (West 2018). Defendant only challenges the sufficiency of the evidence establishing the aggravating factor, namely, that during commission of the offenses, he acted in a manner that threatened or endangered the life of N.W. or her mother.

¶ 29    "[T]he aggravating circumstances of a threat or an endangerment of the life of the victim must exist during the commission of the offense, that is, while the offender is engaging in the conduct that constitutes the offense." *Giraud*, 2012 IL 113116, ¶ 13. The act which threatens or endangers the life of another must occur during the commission of the offense or "so close to the

time of the occurrence as to be an inseparable part of the offense." *People v. Singleton*, 217 Ill. App. 3d 675, 687 (1991).

¶ 30    Here the offense is criminal sexual assault, which occurs when a person "commits an act of sexual penetration and uses force or threat of force." 720 ILCS 5/11-1.20 (West 2018). As this court has held, "the 'offense' of criminal sexual assault is not merely sexual penetration, full stop— it is sexual penetration plus the use or threat of force, a separate element of the offense." *People v. Smith*, 2019 IL App (1st) 161246, ¶ 28. Although the act of sexual penetration occurs at a fixed point in time, the use or threat of force "does not occur solely at the precise moment of sexual penetration." *Id.* at ¶¶ 28-9.

¶ 31    The use of force precedes the act of sexual penetration by "whatever amount of time it takes to 'overcome' the victim." *Id.* at ¶ 30 (citing 720 ILCS 5.11-.1 (West 2014) (defining use of force as occurring "when the accused overcomes the victim by use of superior strength or size, physical restraint, or physical confinement")). As to a threat of force:

> "It is so obvious that it hardly requires saying: A threat of force precedes the sexual penetration by some amount of time; it lingers over the victim, who is subdued precisely because the victim has a reasonable belief that the accused 'has the ability to execute that threat' of force." *Id.* at ¶ 31 (citing 720 ILCS 5.11-0.1 (West 2014) (defining threat of force as "when the accused threatens to use force or violence on the victim * * *, and the victim under the circumstances reasonably believes that the accused has the ability to execute that threat")).

¶ 32    Thus, the criminal sexual assault offense does not begin and end at the fixed time of sexual penetration. *Id.* at ¶ 32. The use or threat of force may continue during the sexual penetration, but

the phrase "during commission of the offense" must include the time in which the offender used or threatened force. *Id.* "Any other reading would ignore one of the elements of criminal sexual assault and focus exclusively on the other, sexual penetration." *Id.*; see also *People v. Calderon*, 2022 IL App (2d) 200029-U, ¶ 44 (to sustain a conviction under section 11-1.30(a)(3), a defendant's acts threatening or endangering the life of the victim or another person may occur either before or after the assault, but must be sufficiently close in time and closely linked to the sexual acts).

¶ 33    To establish defendant acted "in a manner that threaten[ed] or endanger[ed] the life" of N.W. or her mother, the State had to establish "overt acts by the defendant, and not verbal threats, which endanger or threaten a victim's life." *Singleton*, 217 Ill. App. 3d at 687. Our supreme court has subsequently clarified that "to act in a manner that threatens a victim, the offender must communicate the threat to the victim by word or deed." *Giraud*, 2012 IL 113116, ¶ 15.

¶ 34    Here, N.W. testified defendant committed acts of sexual penetration against her at least 10 times during the charged period between November 2017 and November 2018. Prior to one sexual assault, defendant displayed a thick white extension cord on N.W.'s mother's bed. N.W. testified that "during" other sexual incidents, defendant "would get the extension cord" and threaten to kill N.W.'s mother, stating he would beat her mother when she came home from work. Defendant "would just be very, very violent and say violent stuff" to N.W. and threaten to beat her with the cord if she did not do as he said.

¶ 35    N.W. never testified that defendant directly threatened or endangered her life. However, defendant, an adult male, was both "very, very violent" toward N.W. and said "violent stuff" to her, which evidence supports an inference of both physical and verbal violence toward her. Further,

N.W. testified that, during the sexual assault offenses, defendant displayed the thick electrical cord, threatened to beat her with it, and threatened to kill her mother. N.W. then clarified that, in regard to killing her mother, defendant threatened to beat her mother when she came home from work. Defendant's display of the extension cord, taken with his words, support the reasonable inference that he threated to beat N.W.'s mother to death if N.W. did not cooperate with him or told anyone about the assaults. The evidence of the verbal threat to beat N.W.'s mother to death, taken with the threat to beat N.W. with the extension cord he physically held, was sufficient for a trier of fact to find defendant communicated a threat to N.W.'s life. See *Giraud*, 2012 IL 113116, ¶ 15 ("to act in a manner that threatens a victim, the offender must communicate the threat to the victim by word or deed").

¶ 36    Defendant argues that it is unclear from N.W.'s testimony whether he actually said anything threatening N.W.'s mother's life. He states that, although N.W. claimed defendant threatened to kill her mother, she later elaborated that he actually said he would beat her mother. But this court's review of the testimony demonstrates that N.W.'s clarification was in response to the State's question about what defendant said "in regards to" the threat to kill her mother, *i.e.*, what he said about killing her mother. Nothing in N.W.'s testimony reflects that, by her clarification, she intended to retract her statement that, during the sexual assaults, defendant threatened to kill her mother. In sum, we find it a reasonable inference from the evidence that defendant, by word and deed, acted in a manner to threaten the life of N.W. sufficient to establish the aggravating factor for aggravated criminal sexual assault.

¶ 37    Defendant next contends that his defense counsel was ineffective for failing to adequately question N.W. regarding the bond hearing in order to lay the foundation for impeachment that

would be presented via Nesbitt's testimony about what she heard N.W. say at the bond hearing. According to defendant, counsel was then further ineffective for failing to perfect the impeachment of N.W. during Nesbitt's testimony by questioning her about the bond hearing.

¶ 38    We review claims of ineffective assistance of counsel using the test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Manning*, 241 Ill. 2d 319, 326 (2011). A defendant must demonstrate that (1) counsel's performance was objectively unreasonable under prevailing professional norms and (2) the deficient performance prejudiced the defendant. *People v. Veach*, 2017 IL 120649, ¶ 30. A defendant must satisfy both prongs to establish ineffective assistance. *Id*. To satisfy the first prong, a defendant must overcome the "strong presumption" that counsel's action or inaction was the product of sound trial strategy and not incompetence. *People v. Martinez*, 342 Ill. App. 3d 849, 859 (2003). To satisfy the second prong, "a defendant must show there is a reasonable probability that, but for counsel's insufficient performance, the result of the proceeding would have been different." *People v. English*, 403 Ill. App. 3d 121, 135 (2010). The prejudice prong "entails more than an 'outcome-determinative' test," and the defendant must establish that "counsel's deficient performance rendered the result of the proceeding unreliable or fundamentally unfair." *People v. Easley*, 192 Ill. 2d 307, 317-18 (2000). Our review is *de novo*. *People v. Demus*, 2016 IL App (1st) 140420, ¶ 21.

¶ 39    Counsel's failure to call witnesses who would have contradicted the State's evidence and supported the defense can indicate deficient performance. *People v. Bass*, 2022 IL App (1st) 210249, ¶ 30. Similarly, "the complete failure to impeach the sole eyewitness when significant impeachment is available" may support an ineffective assistance claim. *People v. Salgado*, 263 Ill. App. 3d 238, 246-47 (1994). When assessing failure to impeach, "[t]he value of the potentially

impeaching material must be placed in perspective." (Internal quotation marks omitted.) *Id*. "If the defendant can show his trial counsel failed to perform any meaningful adversarial testing of the State's case, the court will presume the defendant was prejudiced." *People v. Milton*, 354 Ill. App. 3d 283, 289 (2004). The reviewing court should consider the totality of the evidence in weighing the impact of counsel's alleged errors, and "must look to the ramifications" that counsel's error "might have had on the factfinder's overall picture of events." *People v. McCarter*, 385 Ill. App. 3d 919, 935-36 (2008).

¶ 40    As noted, defendant argues that counsel was ineffective for not questioning N.W. about the bond hearing and not asking Nesbitt about her observations of N.W. at the bond hearing. As neither N.W. nor Nesbitt testified about the bond hearing, however, the only information in the record pertaining to that matter is the offer of proof provided by defense counsel. "[T]he key to saving for review an error in the exclusion of evidence is an adequate offer of proof in the trial court." *People v. Andrews*, 146 Ill. 2d 413, 420-21 (1992). The purpose of an offer of proof "is to disclose to the trial court, the opposing counsel and, eventually, the reviewing court the nature of the offered evidence." (Internal quotation marks omitted.) *People v. Wright*, 2012 IL App (1st) 073106, ¶ 121.

¶ 41    Here, the offer of proof was inadequate to disclose to this court the nature of the offered evidence. The offer of proof only pertained to the questions that counsel sought to ask Nesbitt regarding her observations of N.W. at the bond hearing. Counsel did not advise the court how Nesbitt would have testified. Rather, counsel informed the court of the questions that counsel sought to ask her. Further, counsel made no offer of proof as to what counsel would have asked N.W. regarding the bond hearing and how N.W. would have answered.

¶ 42 Generally, defendants must raise ineffective assistance claims on direct review if apparent on the record. *Veach*, 2017 IL 120649, ¶ 46. However, "[w]hen the four corners of the record is insufficient to address the issue of ineffective assistance of counsel, this court may decline to adjudicate the claim in a direct appeal in favor of addressing it in a proceeding for postconviction relief where matters outside the common law record can be considered." *People v. Winkfield*, 2015 IL App (1st) 130205, ¶ 28. In this case, the evidence adduced at trial and the content of defense counsel's offer of proof do not establish what N.W. and Nesbitt would have testified regarding the bond hearing. Without that information, we cannot determine whether counsel's failure to adduce that information was deficient, or whether defendant was prejudiced by counsel's omission. It is therefore impossible at this juncture to resolve defendant's claim regarding defense counsel's failure to perfect N.W.'s impeachment. As the claim relies on evidence outside the trial record, it is better suited for collateral proceedings and we decline to address it here. See *People v. Harris*, 2018 IL 121932, ¶ 48 ("claims of ineffective assistance of counsel are commonly raised in postconviction proceedings because they often require presentation of evidence not contained in the record"); see also *People v. Ligon*, 365 Ill. App. 3d 109, 122-23 (2006) (declining to consider a claim of ineffective assistance of counsel where deficiencies in the record prevented the court from "adequately address[ing] defendant's contentions").

¶ 43 Because we have determined that the record on appeal does not allow review of defendant's claim that counsel was ineffective for failing to question N.W. or Nesbitt regarding N.W.'s statement at the bond hearing, we also cannot review whether the trial court's failure to grant a continuance to recall Nesbitt was error.

¶ 44 "When reviewing a denial of a request for a continuance to secure the presence of a witness, we consider (1) the diligence of defendant, (2) whether defendant has shown that the testimony was material and may have affected the verdict, and (3) whether the exclusion of the testimony prejudiced defendant." See *People v. Miles*, 2020 IL App (1st) 171258, ¶ 40. A trial court abuses its discretion in denying a request to recall a witness "when the denial will deprive the defendant of an opportunity to present evidence crucial to the defense." *People v. Lewis*, 223 Ill. 2d 393, 405-06 (2006). Here, given the deficiencies in the record, we are unable to determine whether defendant was, in fact, deprived of the opportunity to present critical evidence and, therefore, cannot review whether the trial court abused its discretion for denying counsel's request for a continuance to recall Nesbitt. See *People v. Chapman*, 194 Ill. 2d 186, 241 (2000) (a court's denial of a continuance is reviewed for abuse of discretion).

¶ 45 In conclusion, for the foregoing reasons, we affirm the judgment of the trial court.

¶ 46 Affirmed.